Case 18-5980, USA v. Eddie Harris, argument not to exceed 15 minutes per side. Mr. Lazarus, you may proceed for the appellant when ready. Good morning. It may please the Court. Jeff Lazarus, Federal Public Defenders, on behalf of Mr. Harris. I would like to reserve three minutes of rebuttal, if I may. Fine. Thank you. Eddie Harris is serving a 15-year sentence for illegally possessing a firearm. The District Court erred in denying Mr. Harris' motion to suppress, as the search warrant in this case was based on false and misleading statements in violation of the Fourth Amendment. Let me get past the search warrant. Your client was a probationer, and did he not consent to warrantless searches of his residence based upon reasonable suspicion? Wasn't that a condition of his probation? That was a condition, Your Honor. So why do we even have to look at the search warrant? Your Honor, because the search warrant was the sole mechanism that law enforcement used to get into the house and to get to him. Well, I mean, the facts are the girlfriend came out of the house, informed the police that your client had a shotgun in the house, and he meant to use it against the police. Isn't that reasonable suspicion to believe he has a weapon inside the house? Your Honor, I think the story has to begin a little further back than that. The probation officer did seek to get an arrest warrant and did seek to do a search. Forget about the warrants. I mean, he's consented to a warrantless search of his house based upon reasonable suspicion. That's a condition of his probation. So let's throw away all the warrants. Why isn't that a reasonable suspicion? Doesn't that create reasonable suspicion necessary for a warrantless search? Because the officers did a search by sending off these flashbangs without having first seen whether or not Mr. Harris was in the house. Well, okay. They had a loudspeaker and flashbangs. Was that a search, in your opinion? They used the loudspeaker. There was no response. There was no search at that point, right? That's correct. You're alleging a Fourth Amendment violation, so you have to establish a search. They're making noise out there. How is that a Fourth Amendment violation? That's not a Fourth Amendment violation, but there was no response. They did no verification that Mr. Harris was in the house. There was no response by anyone. The house could have been empty. So it's some sort of a constitutional violation to make noise outside of his house? No, that wasn't enough. Then they went and set off these flashbangs outside the house, which we believe that constituted a search. A search? Well, the point is it was part of the execution of the search warrant. They hadn't entered the residence, though, right? They were outside. They were there with the search warrant to execute the search warrant, armed with that. That was the only reason that they were there. Why are you saying that they were there only in connection with the search warrant when they had an arrest warrant? They had an arrest warrant, but they were not there to execute the arrest warrant. What establishes that? Detective Owens' own testimony. And if we begin on page ID 265, we look at the fact that Detective Owens was tasked by his commander to go get the search warrant. He said that they were in the process of getting an arrest warrant at that time. They did not have an arrest warrant yet. But he goes at his direction of his commander to get a search warrant. He's told by the strategic response team that he has to get a search warrant. He doesn't need a search warrant. He doesn't need an arrest warrant because he's allowed to have a warrantless search of the residence based upon reasonable suspicion. So I know you spend all your time on the warrants, but I think it's really irrelevant. But, Your Honor, I believe that they are material because that's why they were there. They were armed with a search warrant. So what? They ended up there because they intended to do something else. I mean, we look at the objective evidence for Fourth Amendment violations, not subjective considerations. And objectively, did they violate the Fourth Amendment? No, they didn't. Your Honor, but the point is that law enforcement did nothing to verify that Mr. Harris was actually in the house. So what? If they had seen him on the porch. They didn't enter the house until the girlfriend said he was in the house and had a gun. That's correct. Could I go back just a step here? I'm not so sure the best analysis is to disregard both of the warrants. At the time that they did these things at the house, did they have an arrest warrant at that point? That is not clear from the record. The testimony that's cited in the government's brief, and I believe it was Detective Trooper Amon, said that Trooper Allen probably served Mr. Harris with both warrants after the arrest. But there's nothing in the record that demonstrates that the law enforcement officers had an arrest warrant in hand and were serving it at the time that they went to the house. If they had found Mr. Harris on the street in front of his house, could they have arrested him for his probation violations? Absolutely. They could have either done it because he violated and because of the arrest warrant, but that's not the case here. Well, even without the arrest warrant, they had information that he had violated his probation conditions. Is that right? I'm trying to figure out why were they interested in him to begin with. His probation officer had found that he had violated the terms of his probation because there was a complaint in state court, which Mr. Harris had disclosed to his probation officer. And then he had not shown up when the probation officer asked him to show up, so he's in violation of the probation conditions. So he could be arrested on the basis of reasonable suspicion because he had violated his conditions of probation. Had they seen him and known where he was? Had they seen him outside? So they think that he's at his house, but we don't have probable cause to believe that he's at his house at this point. So they go to his house, and they do not go into his house, but they set off flashbangs. So I'm forgetting about all the warrants, that kind of stuff. The flashbangs are devices that make a big noise and light outside the house. Is that it? That's correct, but I want to just direct the court that first they got on a loudspeaker and said, come on out, we know you're in there. There was no response by anyone. They didn't see curtains moving. They didn't see any indication that he was in the house. There was nothing to believe that he was holed up in there. For all they knew, no one was in the house, so then they set off the flashbangs. And then the girlfriend comes out and says he's in there with a gun. That's correct. And then they send tear gas in, to which Mr. Harris comes out. Would you agree that there's clearly reasonable suspicion at the point where the girlfriend says he's in the house with a gun? That's correct. So the problem, the problem point here, in your estimation, is their conduct outside the house. The law enforcement's conduct? Yes. Yes, that's correct. So do you have any cases that say that you can't set off, you can't use loudspeakers and set off flashbangs outside a house to try to get somebody out? I am not aware of that. Or alternatively, that says, as you said earlier, that it's a search. But I think it's, no, I don't have any cases to that, Your Honor. But I think that it's clear that an arrest warrant allows you to go out and if you see the person, you may arrest them. A search warrant says if we see, if we believe there is evidence at this property, we can search it. They did nothing to verify that Mr. Harris himself was in the house. All they believed was he might be living there, and we have the search warrant, and that's enough. This gives law enforcement carte blanche to say, well, we have an arrest warrant, so we can search your friends, your family, your girlfriend, your sister, whoever. This is not what an arrest warrant allows. What they did was they took it a step further and went to get a search warrant, and that search warrant was riddled with misleading and false statements, and the government does not contest that there are misleading and false statements in here. We have a Franks violation, and the search warrant was the sole mechanism that law enforcement used to go to the property where they believed Mr. Harris would be to get him out of the house and everything, all the evidence that they obtained in this case were fruits of the search warrant, not an arrest warrant. And the house is not a house that he owns or lives in? All we know from the record is that the probation officer said that that's the house he was living at while under supervision, so he could have been staying somewhere else, but law enforcement did nothing to verify that he was staying there, that he was living there. There's nothing in the record to say that the house was in his name. But this isn't the kind of case where you're trying to figure out a way to get in a house to see if a drug dealer is there and has drugs. This guy is obligated to tell the probation officer where he lives, right? That's correct. And if he moves, he's got to tell her. That's correct. And he hadn't told her that he lived someplace else, so why is there any mystery about why it was reasonable for them to believe that that's where he lived? It's reasonable to believe that that was where he was living and that's where he was staying, but law enforcement has a duty to, if they are effectuating the arrest warrant, or if they are using reasonable suspicion because he is on probation, they have a duty to find out that the person is actually in that house so that they don't go in and find nobody. They could have waited outside for an hour around the street, looked to see when he comes out to his car, and waited for him on the porch. They didn't do that. They immediately go, and what they're clearly trying to do is gain access to the house. This isn't about Mr. Harris. This is about them armed with a search warrant and only a search warrant to get into that house to try to get evidence, and that's exactly what they did. They were trying to arrest him, that that was their purpose, because the probation officer asserted and had evidence that he had violated his probation conditions. Specifically, the probation officer told him to show up because of a state court matter, and he doesn't show up, which seems to be a pretty clear-cut violation. But the truth is that Detective Owens, who was leading the operation, said he had to get a search warrant. The search warrant is the key mechanism here. Owens may have been wrong about that. The concern that I have is if we forget about the warrants and say maybe they're bad warrants, could the officers go to this house where the probation officer says he's supposed to be living because he said he was living there, and the probation officer says he didn't show up when I told him to, and he's admitted that there is this state court matter going against, that's proceeding. And so, could the probation officers go to this house and, you know, they could arrest him if he was on the street in front of them. Correct. But there's some limit on police officers going into some house, so they try to get him to come out by making a lot of noise. And is there a case that says that is good, bad, or indifferent? I am not aware of a case, good or bad. I just know that by not verifying that he was in the house, they weren't just there to arrest him. They are armed with a search warrant. They were clearly trying to get the police to come out. That's how they're trying to verify he's in the house. They're trying to lure him out. Isn't that what they're seeking by way of these loudspeakers and flashbangs? It seems so, yes. Could they knock on the door and say they were selling Girl Scout cookies? Sure, they could do that as well. As I see my time is running low, I want to switch gears to the plea. The district court committed plain error by improperly advising Mr. Harris as to the statutory penalties in this case and violated Criminal Rule 11. We all agree there was an error and that the error was obvious because the district court failed to advise him of the Armed Career Criminal Act's statutory penalties. He was advised at his first plea of that, right? He was advised. He had two pleas here. You're arguing that at his second plea, he was not advised as to the consequences, but he was aware in the same proceeding because of the instructions at the first plea, plus he was on notice through the pre-sentence report, was he not? Those documents are part of the record. How is there reversible error here, particularly when there's no objection? Your Honor, may I finish? I see my time is up. Your Honor, Mr. Harris, through the plea colloquy, said the career criminal statute is off the table. The district court did not rectify that, did not say, oh, yes, it is, and there's a 15-year mandatory minimum. The district court let it alone. Had the district court properly advised Mr. Harris that the 15 years was still on the table and he could be subject to it, there's a reasonable belief that he would have gone to trial, as he had previously. And we think it's worth noting that at the pretrial before the trial in which he ultimately pled guilty, he did say that he had been offered a seven-year binding plea by the government. And we believe that that goes to Mr. Harris' state of mind, that he believed the 15 years didn't apply, that he could get below the 15 to go to seven, and that his statutory penalties, as advised by the district court, were zero to 10 years. And the district court did nothing to dissuade him of that or let him know what the proper statutory penalties are. Therefore, we believe it constitutes plain error. Thank you. Thank you. May it please the Court. Lauren Tanner Bradley for the United States. I'd like to start out just quickly addressing some of the suppression issues, just to clarify for the record, it is in the record that there was a probation violation arrest warrant. That is at R-72 at page 243. The probation file is also in the record. I do not have a site for that, but this would have been listed as his residence. It was the understanding of all the officers involved that this was his residence. A probation officer was present to execute that warrant. And I think that it is clear on these facts that a warrant was not required once Ms. Hodge exited that residence and stated that Mr. Harris was inside with a firearm. Before that happened, could the police officers go into his house without any other information than we know? Before Hodge exited, could the officers have gone inside the house? Before the whole flashbang episode. At that point, the officers would not have had, well, I guess I'm trying to understand the question exactly, at the point of the flashbangs? No, you said there was a probation violation arrest warrant. Correct. I'm asking, on the basis of that probation violation arrest warrant, could the officers go into his house to get him out, to arrest him? Based on a reasonable suspicion that Mr. Harris is inside and that they have an arrest warrant, I think that they could have gone inside. That's what the arrest warrant is, isn't it? That they're allowed to arrest him? Yes, correct. That includes entering the house. It doesn't include searching. Correct, it would not include searching the house. It would allow them to arrest him if he's in the house. Yes, I believe so, Your Honor. Is there a case that you would rely on for that principle? I do not have a case for that principle. Does it matter? I mean, they don't even need a warrant, do they? I do not know if probation officers need a warrant. No, under this circumstance. The condition of his probation is that he is consented to warrantless searches of his home based upon reasonable suspicion. Correct. Warrantless means without a warrant. Correct. He's consented to searches without a warrant, so whether there's a warrant or not is... Correct. And in this case, the reason that they even went to go get the warrant had more to do with KSP policy than it had to do with any requirement by law enforcement. It's redundant. It's superfluous. So, with the reasonable suspicion, and the probation officer knowing that he hadn't reported to the probation officer as demanded by the probation officer, can the probation officer get the police to break down his door and arrest him in his home? Under those circumstances, if they know him to be in his home, I believe... No, I didn't say they knew him to be in his home. They have reasonable suspicion that he might be there in this simple sense that he has told the probation officer that that's his place of abode, is my understanding of the facts. And they have no reason to know whether he is or isn't there. And we don't know that it is his own home. It could be the girlfriend's home. It could be some other friend. Yes, I think that they could still go in. Typically, these conditions require... Require him to break down the door and go in, if he doesn't answer the door. I believe that they have reasonable suspicion to believe that he's in there, and he himself, in that sense, is the contraband, so yes. The whole question is, can they enter with an arrest warrant without permission to come in the house? If somebody lets them in, that's an easy one. But can they break somebody else's door down to arrest somebody because they have reasonable suspicion they're in the house? I suspect the answer to that is no, but I don't know. And I suspect that's why they were setting off flashbangs and using loudspeakers in the lawn. Otherwise, they'd just go up and break the door down. Well, I think that under these circumstances, they are in a position where they're, quite frankly, afraid of this individual, and they're trying to create the safest situation possible. And I suppose going and breaking down anyone's door certainly wouldn't be something that they could do, but they could certainly approach the door, knock on it, and execute that warrant once they see him inside. The police officers, I don't have case law specifically to some of the points that you're raising, but there is case law that police officers are allowed to do what the general public may do. You can approach by the driveway. You can go up to the door. You can knock on the door and ask if they're available. But the general public can't set off flashbangs and loudspeakers in the front yard. They can't break down somebody's door. So how does that help you? I think that what the officers did in this instance was permissible under the Fourth Amendment, based on the conduct that they engaged in. If someone from the general public went outside and made lots of noise and it elicited a response, that would be something that could be done. And so here, what the police officer did is something that someone from the general public could engage in. Can we talk about the facts of this case? Yes. Didn't the defendant come out of the house? Yes. I mean, he didn't have to break down the door to have him come out. I mean, after the flashbangs went off, he came out himself, right? Correct, he did. Okay, so I don't know what the... They tear-gassed him, right? They did. They used tear gas... He shot tear gas into the house. That's why he came out. They shot tear gas into the house after Ms. Hodge had come out and told officers that he was preparing to shoot. I'm just saying he didn't voluntarily, in the normal sense of that word, wander out to say, hey boys, what's going on? No, he did not come out of the house just to see what was going on. In fact, he said, if you hadn't gassed me, it's a good thing you gassed me because otherwise I would have shot you. Yes, those are the facts of this case, and that would certainly support reasonable... He came out of the house. That's when they went in and searched and found the shotgun. Exactly. I think he even admitted that he had in the bedroom or something. Yes, he told the officers... We're talking, the issue on appeal is the denial of a motion to suppress, and all these hypotheticals are kind of interesting, but we look at the facts of this case. I agree. Is there a Fourth Amendment violation under these circumstances? I think the answer is clearly no. I would completely agree, Your Honor, that under the facts of this case, Ms. Hodge comes out, makes these statements, and the officers at that point shoot tear gas. Mr. Harris comes out, tells them where the firearm is, and they go into the house and find it at that point. There certainly was no warrant required. I don't assume that there's a reason, that's a legitimate reason, that causes Ms. Hodge to come out of the house. If you're going to rely on Ms. Hodge saying, oh, he's in there and he's got a firearm, you have to have a reason why she's coming out of the house. And if she were just, you know, like if you were pretending, if you had the police pretending to be selling Girl Scout cookies, and they knocked at the door, and Hodge opens the door, and the pretend Girl Scout says, hey, is Harris in there? And she says, yes, and he has a gun. That's one thing. But that isn't what happened. Here you are relying in essence on the fact that the probation officer has reasonable suspicion that Harris has violated his probation conditions and has reasonable suspicion that Harris uses this residence as his place of abode because it is listed with a probation officer by Harris as his residence. I don't know what the exact language was, so correct me. But it's where he lives, I guess. Correct. So I was interested in whether that alone is enough for the probation officer to send the police out to arrest him if they don't know that he's at his house at that time. And the way they chose to arrest him was not to knock on the door and see if he opened it and then say, aha, we're arresting you. I thought there were limits as to when police officers can go into someone's house to arrest them without a warrant to arrest. But maybe, you know, you're saying maybe that idea of mine is wrong, which we obviously can find cases one way or the other. And I have not researched that specifically, but I would also argue that having reasonable suspicion to believe that someone on probation is inside the house and who you have a probation violation arrest warrant for, someone who's failing to report. So there's reasonable suspicion to believe someone is in the house if they give the house as their residence. Is that right? Like, I'm not at my house today. Would they have reasonable suspicion to think I'm at my house? I've given it as a residence listing for wherever. And you're an individual who's on probation who's failing to report. Yes, I believe that that arises to reasonable suspicion. They can go inside the house and arrest this individual. Is the issue in this case whether the shotgun should have been suppressed from evidence? That is the motion to suppress the evidence of the shotgun. Yes, the issue of the search. And that's what we're looking at, right? Yes. Whether or not the officers had reasonable suspicion to go into the house to obtain that shotgun. They want the shotgun to be suppressed. That's what we have in front of us. Yes. Thank you. And under these circumstances, I think that they did have reasonable suspicion to go in the house. Based on the facts of this case, I think it is a very clear issue. Could you address the plea? Yes, I would be happy to address that. Under these circumstances, this court needs to look at the entire record. Doing so, it is very clear that this defendant knew the penalties. It was in the indictment. There was a notice of enhanced statutory penalties filed. That's at record three. He was advised of the penalties at his initial appearance and arraignment. He moved to continue the first trial so that his counsel would have additional time to research the issue. At the suppression hearing, Mr. Harris raised the issue himself, asking the court if he would be an armed career criminal. During the first rearrangement, it was correctly advised of all the penalties in this case. There was a lengthy discussion. Mr. Harris says, I always wanted to plead. He was afraid of the life sentence. That is his own term. Those are his own language. And he still pleads anyways. He receives a PSR after that point. That's at R98. This advises that he has a 262 to 310 month imprisonment sentence recommended guidelines range. There are objections to the classification by his defense counsel. He files pro se objections himself. This is all based on whether his criminal history meets the requirements of the ACCA. There's a motion hearing where his defense counsel states, on the record, I have been laboring for hours and hours and hours trying to find a non-frivolous workable argument as to why it does not apply. This is something that the prosecution also addressed. It was addressed at length. In his second motion to withdraw the plea, he references the ACCA. During his competency hearing, he specifically mentions that the PSR references a 24-year and 10-month guidelines range. During the second rearrangement, the court actually directs his attention to the penalties page, misadvises him by not stating 15 years up to life. But I state the ACCA might apply. This could lead to greater penalties. He says the career criminal is off the table. The court says, I can't make you any promises about what I don't know if you're a career criminal or not. She later says, I don't know whether it applies or not. If I apply it and you think it's wrong, you could appeal that. Do you want to plead guilty? Yes, let's do it. He knew. These are terms of art that we were using, but they were terms of art that Mr. Harris fully understood. The parties had discussed this ad nauseum. Ideally, we would have stated the exact penalty range, but parties, I think, took for granted what this would look like on a record and took for granted that it might be looked at as a blank slate, which is why I'm asking this court, you cannot look at this on a blank slate. You have to consider the entire record here. I would also just say that Mr. Harris benefited greatly from this plea. There was reference to the seven-year binding plea agreement. That was rejected by Mr. Harris. That is in the record. It was rejected because he wanted to appeal his suppression issue. If you look at all of these hearings holistically, it becomes very clear that Mr. Harris wanted to appeal the suppression issue. That was his issue with this case. He did not like how that firearm was obtained, and that is what he wanted to appeal. He wanted to bowl a strike. He rejected a deal that I think most people advised him to take, but that was his choice, and he did make it knowingly in this case. Did he have gotten a seven-year plea? You're saying that was what— That was offered to him, yes. How would you avoid the ACCA there? You were just not going to charge the— The parties can come to an agreement in the plea agreement that allows a binding sentence, and that would be a way to avoid it. It would be a situation at sentencing where it's not proved up, and that would be a way of avoiding the ACCA. When you say it's not proved up, you're talking about his prior criminal history. Is that it? Correct, yes. If there are no further questions, I will stand on my briefs. Thank you. Your Honors, first I want to address what the government just said, that Mr. Harris benefited greatly from this plea. We have a 69-year-old man who got a 15-year sentence, so he's going to die in prison. There's really no dispute about that, so to say that he benefited greatly just really isn't true, and it's not borne out by the facts. But as to the suppression issue, being on probation is not carte blanche to have your person or your house searched whenever anybody wants. The law enforcement has to show some sort of reasonable suspicion that Mr. Harris had contraband on the property to justify a warrantless search, or that he was at that property to justify taking him into custody for his violation. The government did nothing in this case to verify that he was at this property. And I believe that normally, the court got the standards, and I think the standards are important, that normally a warrantless arrest can be done by finding a probable cause, but because he was on probation, there's still a need that there's a reasonable suspicion. The law enforcement took no actions to verify that Mr. Harris was at that house. In fact, Detective Owen's own testimony says, well, I was told to get a warrant. Before that, I went to the house. I couldn't find anyone there. I went back and got the warrant, and then when I got the warrant, we all came back. He was driving a Bobcat or something like that with a number of other law enforcement officers. We made announcements over the loudspeaker. There was no response at all. It seems to me that you may be conflating a couple of different things here. The ability to enter the house under the terms of probation is accompanied by this question of reasonable suspicion. But where does the duty arise, in your estimation, to have reasonable suspicion that he's at the house before you approach the house to try to find out if he's in there? They can do a warrantless search with reasonable suspicion to believe that there's contraband on the property. I'm not at the search. Correct. You seem to be saying, one time you're saying that the flashbangs in the loudspeaker are a search. There doesn't seem to be any authority for that. You seem to be saying they had to verify that he was at the house before they can do the things that they did. Where does reasonable suspicion become a requirement in order to go to the house to see if he's there? Your Honor, we all have a Fourth Amendment protection to be free from unreasonable searches and seizures. I believe that under that, the law enforcement has a duty to make sure that if they are executing an arrest warrant for a specific person, that there at least be a reasonable suspicion that that person is there at that time. They can't go back and say, well, we have a reasonable suspicion that you're at these nine houses. You agreed earlier that they could walk up and knock on the door and see if he answered it. Absolutely. Absolutely. They could have knocked on the door. You don't have to have reasonable suspicion to do a knock and talk. No, but I believe that when the... You just have to have reasonable suspicion to actually enter. When law enforcement takes it a step further and operates flashbangs, which can be dangerous and is hazardous, that that is something that goes well beyond just a knock and talk. What authority do you have? Your Honor, I was unable to find any cases that say that. However, if the court wishes supplemental briefing on that point... I don't think there are any cases. That's why I think you're... I guess you'd like us to establish that that's the law, but it's hard for me to see how that's a search. Well, I believe with the law enforcement... I guess that's what you're arguing. We're arguing that under the Fourth Amendment, that law enforcement took it a step further, took it too far without verifying that Mr. Harris was in the house, that it was a search. I know, but you have no authority. You're just making it up as you go along, and you think maybe that should be the policy, but... Your Honor, I believe that's a reasonable interpretation of the Fourth Amendment, and for that we would ask the court... You have no authority to say that, too. I was unable to find any case to support that or go against it. We always kind of like authority. I wish there was some as well. Law is good. I don't know. Creative arguments are fun, too. You haven't found any authority to the contrary. I have not, Your Honor. So that would show that then we would be making law if we were to adopt the contrary position to yours. I believe that's true, and we ask the court to find that, make that finding, and reverse the district court's finding denying the motion to suppress. Thank you very much. Thank you. Thank you both for your argument, and that this case will be submitted as well with the clerk recess court.